AMERICAN AIRLINES, INC., 4333 Amon Carter Boulevard, Fort Worth, TX 76155 Plaintiff,

v.

ALLIED PILOTS ASSOCIATION, 14600 Trinity Blvd., Suite 500, Forth Worth, TX, 76155–2512

and

Richard T. LaVoy, 4100 Vista Creek Court, Arlington, TX 76016–6407 its President

and

Brian A. Mayhew, 132 Chesapeake Bay Drive, Stevensville, MD 21666–3864 its Vice President

and

Robert P. Morgan, 3608 Cold Creek Drive, Valrico, FL 33594–6348 its Secretary–Treasurer

and

David O. Aldrich, 221 Chasse Circle, Saint Charles, IL 60174–5723

and

Robert Ames, 17229 Balboa Point Way, Boca Raton, FL 33487–1014

and

Stanley C. Bissell, 28 Glengarry Road, Stratham, NH 03885

and

Denis M. Breslin, 894 Singing Trails Drive, Cajon, CA 92019–2756

and

Dennis DellaGreca, 456 Redding Road, West Redding, CT 06896

and

J.S. Ditty, 2809 200th Ave. E., Sumner, WA 98390

and

Ernest L. Dryer, 726 Holly Drive, Annapolis, MD 21401–5553

and

David P. Duquemin, 8 South 330 College Road, Naperville,

IL 60540

and

L.G. Foster, 13475 Lambert Lane West, Roanoke, TX 76262–6197

and

Daniel W. Hall, 727 Appleridge Drive, Encinitas, CA 92024

and

Charles T. Hepp, 10113 Community Lane, Fairfax Station, VA 22039–2515

and

Lloyd D. Hill, 2728 NE 12th Street, Pompano Beach, FL 33062–8261

and

Mark L. Hunnibell, 2611 Long Hill Road, Guilford, CT 06437–3616

and

Jeff Marchand, 49 Trask Mountain Road, P.O. Box 300, Wolfeboro, NH 03894–0300

and

Norman A. Patterson, Jr., 3406 Forestshire Court, Arlington, TX 76001–4848

and

Donald W. Pitts, 1119 Woodland Place, Sand Springs, OK 74063–8961

and

Steve Roach, 33 Prairie Falcon Drive, Novato, CA 94949–6636

and

S. Randy Trommer, 550 Edinburgh Circle, Danville, CA 94526

and

Michael R. Mellerski, 2521 Branch Oaks Lane, Lewisville, TX 75028–4696

and

John E. Darrah, 1332 Stonecrest Drive, Coppell, TX 75019–3724

and

L.P. Turcotte, 79 Beauty Hill Road, Barrington, NH 03825–3522

No. 7:99–CV–025–X.

United States District Court, N.D. Texas, Wichita Falls Division.

June 23, 1999.

Dee J. Kelly, Donald E. Herrmann, Kelly, Hart & Hallman, P.C., Fort Worth, Texas, Harry A. Rissetto, Thomas E. Reinert, Jr., Morgan, Lewis, Bockius, L.L.P., Washington, DC, for plaintiff American Airlines, Inc.

Sanford R. Denison, Baab & Denison, Dallas, Texas, Edgar N. James, Steven K. Hoffman, James & Hoffman, P.C., Washington, DC, Robert H. Stropp, Mooney, Green, Baker, Gibson, & Saindon, P.C., Washington, DC, for the defendants.

### MEMORANDUM OPINION (CONTAINING FINDINGS OF FACT AND CONCLUSIONS OF LAW) AND CONTEMPT AND DAMAGE ORDER

KENDALL, District Judge.

On February 13, 1999, the Court granted Plaintiff American Airlines, Inc.'s ("American") motion for civil contempt of court[1] against Defendants Allied Pilots Association ("APA"),[2] Union president Richard LaVoy ("LaVoy"), and Union vice-president Brian Mayhew ("Mayhew").[3] These Defendants were held in civil contempt of court, after an evidentiary hearing, for violating a Temporary Restraining Order entered on February 10, 1999 (the "TRO").[4]

As will be discussed more fully below, this Court has no choice but to hold Defendants APA, LaVoy, and Mayhew responsible for their contemptuous actions in violating this Court's TRO and to hold them accountable for the financial loss their actions caused. By their deliberate and contemptuous actions, these Defendants inflicted millions of dollars in financial losses on Plaintiff American and needlessly disrupted the lives of hundreds of thousands of travelers. Many of these persons suffered financial losses as well, and none had anything to do with this dispute. Furthermore, they had no notice of this action so that they could make realistic alternative travel arrangements.[5]

Under the facts and applicable law, this Court must award to American the compensatory damages which are attributable to these Defendants' contemptuous actions. This Court therefore awards American $45,507,280.00 in such compensatory damages, and Defendants APA, LaVoy, and Mayhew are held jointly and severally liable for these damages. Appropriate post-judgment interest is also awarded to American.

---

1. See Plaintiff's Motion for Contempt, filed February 11, 1999.

2. The APA Union has been the collective bargaining representative of American pilots since 1963. Declaration of Susan Oliver, attached as Exhibit 1 to American's Memorandum in Support of Plaintiff's Motion for a Temporary Restraining Order and Injunctive Relief (hereinafter "Oliver Declaration"), ¶ 2.

3. Defendants APA, LaVoy, and Mayhew are collectively referred to herein as "Defendants" and/or "Contemnors."

4. The TRO was signed and filed by the Court on February 10, 1999. The TRO is incorporated herein by reference.

5. In modern air warfare, collateral damage to innocent civilian non-combatants always seems to be a concern, both for humane and political reasons. It was not a concern, humane or political, in this operation.

## A. BRIEF BACKGROUND

This drama began with the acquisition of Reno Air, Inc. ("Reno"), a relatively small air carrier, by American. On or about November 19, 1998, American announced its intention to purchase the stock of Reno through a tender offer initiated by American's wholly owned subsidiary, Bonanza Acquisitions.[6] On or about December 9, 1998, American received approval from the Department of Justice for the stock acquisition.[7] Thereafter, Bonanza Acquisitions acquired approximately 84.5% of the common stock and 99% of the preferred stock of Reno.[8] Following the Reno acquisition, American advised APA of its intent to operate Reno separately for a transition period because there were legal, operational, and business constraints that prevented integration instantaneously.[9] This proposed procedure was consistent with American's acquisition of Air Cal in 1987, which entailed American operating Air Cal as a separate carrier for a transitional period during which American and APA successfully negotiated an agreement providing for the integration of the pilot workforces.[10] However, despite the parties' prior course of dealing on this Air Cal acquisition, the APA did not agree with American's plan of action with respect to Reno. Rather, the APA took the position that American's operation of Reno with pilots not on American's Pilot Seniority List, albeit on a temporary basis, was in direct violation of the Recognition and Scope Clause of Section 1 (the "Scope Clause")[11] of the current collective bargaining agreement (the "CBA") in effect between American and the APA.[12] The APA took this position even though the language of the Scope Clause of Section 1 of the CBA in effect now is substantially identical to the Recognition and Scope language which bound American and APA at the time of the Air Cal acquisition.[13] Although the parties conducted discussions about the issues raised by the merger, those discussions were not successful in reaching a resolution regarding a number of important items.[14] Despite American's willingness to do so, the APA declined to adhere to their written agreement with regard to a remedy for an alleged violation of the Scope Clause and compel expedited binding arbitration under the CBA.[15] Section 1.L. of the current CBA contains a procedure for expediting the arbitration of grievances arising under the Scope Clause of Section 1.[16]

**6.** Oliver Declaration, ¶ 11.

**7.** *Id.*

**8.** *Id.*

**9.** Oliver Declaration, ¶ 15.

**10.** Oliver Declaration, ¶ 7. Defendant LaVoy testified that even the APA recognized that some sort of integration period was necessary with respect to the Reno acquisition. Defendant LaVoy testified: "I think we're down to an 18-month time frame and they are sitting at 22 months. That piece of the issue is essentially resolved." Transcript of Proceedings—Motion for Temporary Restraining Order and Injunctive Relief, taken on February 10, 1999 (hereinafter the "February 10 Transcript"), page 43.

**11.** Section 1 of the current CBA is titled "Recognition and Scope." Section 1(C) is titled "Scope" and states as follows: "(1) *General.* All flying performed by or on behalf of the Company or an Affiliate shall be performed by pilots on the American Airlines Pilots Seniority List in accordance with the terms and conditions of this Agreement ..."

**12.** Oliver Declaration, ¶ 16.

**13.** Oliver Declaration, ¶¶ 5, 7.

**14.** Oliver Declaration, ¶¶ 13, 14.

**15.** Oliver Declaration, ¶¶ 10, 17, 27.

**16.** Oliver Declaration, ¶ 9. Section 1.L. of the CBA, titled "REMEDIES" provides, verbatim: "(1) The Company and the Association agree to arbitrate any grievance filed by the other party alleging a violation of this Section 1 on an expedited basis directly before the System Board of Adjustment sitting with a neutral arbitrator. The arbitrator shall be a member of the National Academy of Arbitrators and experienced in airline industry disputes. The burden of proof will be determined by the arbitrator. The provisions of the Railway La-

Instead of engaging American in binding arbitration over the Scope Clause dispute before a neutral arbitrator with experience in airline industry disputes as they agreed to do in their contract, a large number of APA's pilot members began an unannounced sick-out of massive proportions.[17] Instigated by the APA and its current leadership, this sick-out entailed having pilots adding their names to the sick list in overwhelming numbers.[18] This illegal job action resulted in a tremendous number of flight cancellations due to lack of crew,[19] costing American millions of dollars in revenues,[20] and impacting hundreds of thousands of passengers throughout the country in the process.[21]

The sick-out began on February 6, 1999, and from February 6–9, 1999, over 1600 American flights had been canceled due to lack of crew.[22] On February 10, 1999, American came to this Court and sought a Temporary Restraining Order to end the sick-out.[23] After spending the better part of a day hearing from both American and the Defendants on the pertinent issues,[24] this Court signed the TRO at approximately 4:00 p.m. on February 10, 1999.[25] As with most such disputes, the action of signing the TRO should have brought an end to the transportation disruption, but sadly it was only the beginning.

It cannot be legitimately disputed that the sick-out actually increased in size after the signing of the TRO.[26] In fact, the largest number of American flight cancellations on a single day during the sick-out occurred on February 11, 1999 (the day after the TRO was signed), when almost 1200 flights were canceled that day alone.[27]

bor Act shall apply to the resolution of any dispute regarding this Section 1."

17. By choosing to engage in a sick-out instead of compelling arbitration as they had agreed to do, this causes one to immediately ask the rhetorical question that if the Union was so sure of the righteousness of their cause on the issue of "Scope," why did they not arbitrate the Scope Clause dispute on an expedited basis before a neutral arbitrator experienced in airline industry disputes that they would get to help select?

18. Plaintiff's Exhibit 43. Transcript of Proceedings—Hearing on the Issue of Compensatory Damages for Violation of Temporary Restraining Order, taken on April 15, 1999 (hereinafter the "April 15 Transcript"), pages 133–135. Plaintiff's Exhibit 1. Transcript of Contempt Hearing, Volume I of II, taken on February 12, 1999 (hereinafter the "February 12 Transcript"), pages 14–16.

19. Plaintiff's Exhibit 2. February 12 Transcript, pages 17–19. Plaintiff's Exhibit 45. April 15 Transcript, pages 143–144.

20. February 12 Transcript, pages 19–20. Plaintiff's Exhibits 47 and 48. April 15 Transcript, pages 185–187.

21. February 12 Transcript, page 19.

22. Plaintiff's Exhibit 2. February 12 Transcript, pages 17–18. Plaintiff's Exhibit 45.

23. In his opening statement, American's counsel gave notice that American would seek contempt sanctions with respect to any violation of a TRO entered in this case when he stated: "And we ask for a restraining order ... We ask for one that's strong enough that the pilots and their union will not simply ignore it without being subject to the contempt action of this Court." February 10 Transcript, page 13.

24. See, generally, February 10 Transcript.

25. TRO, page 4.

26. Plaintiff's Exhibit 43. April 15 Transcript, pages 133–135. Plaintiff's Exhibit 1. February 12 Transcript, pages 14–16. See also the Supplemental Declaration of Timothy J. Ahern, attached as Exhibit 1 to Plaintiff's Motion for Contempt, filed on February 11, 1999.

27. Plaintiff's Exhibit 2. February 12 Transcript, page 18. Plaintiff's Exhibit 45. The fact that the sick-out increased in size *after* the TRO was signed is even more disturbing in light of Defendant LaVoy's comments at the February 10, 1999 hearing. At that hearing, Defendant LaVoy stated "Well, Your Honor, we're going to do whatever you tell us to do." February 10 Transcript, page 52. The Court even recalled Defendant LaVoy's comments later that same day: "... I am trusting as a man of honor Captain LaVoy's representation to me that his pilots are going to do whatever I order." February 10 Transcript, page 86.

That same day, American filed a Motion which sought to hold Defendants in civil contempt of court for having violated the TRO,[28] and a hearing was scheduled for February 12, 1999 on the contempt motion.[29]

After hearing evidence on the contempt motion on February 12, 1999,[30] this Court issued its Order of Contempt[31] and Findings of Fact and Conclusions of Law[32] on February 13, 1999. In the Order of Contempt, Defendants APA, LaVoy, and Mayhew were adjudged to be in civil contempt of court.[33] Because the amount of actual damages suffered by American due to Defendants' contemptuous conduct was not clear on February 13, 1999, the Court required Defendant APA to place $10,000,-000.00 into the Registry of the Court, Defendant LaVoy to place $10,000.00 into the Registry of the Court, and Defendant Mayhew to place $5,000.00 into the Registry of the Court pending resolution of the amount necessary to reimburse the aggrieved party (American) for the amount of money lost because of the Contemnors' conduct.[34] The Court reserved the right to remit monies to Defendants should the amount of damages ultimately awarded be less than the monies paid into the Registry of the Court.[35] A hearing was also set for February 17, 1999 on the issue of compensatory damages.[36]

On February 17, 1999, the parties again convened before this Court so that evidence could be taken on the amount of damages suffered by American due to Defendants' contemptuous conduct. American presented evidence at this February 17, 1999 hearing,[37] but Defendants did not present any evidence. Instead, Defendants requested a continuance so that they could have adequate opportunity to develop the pertinent facts bearing on damages.[38] This motion for continuance was granted, and the hearing on damages was continued until April 12, 1999.[39]

The hearing on damages reconvened on April 12, 1999 and was further continued on April 15, 1999, with Defendants presenting their case on damages and with American presenting rebuttal evidence on damages.[40] At the conclusion of the hearing on April 15, 1999, this Court announced its decision from the bench to award American $45,507,280.00 in compen-

---

**28.** Plaintiff's Motion for Contempt, filed on February 11, 1999, requested that Defendants be adjudged in civil contempt of court and requested the Court impose appropriate fines against Defendants and award Plaintiff appropriate compensatory damages as a result of Defendants' contempt.

**29.** See Order to Show Cause, filed February 11, 1999.

**30.** See, generally, February 12 Transcript.

**31.** See Order of Contempt, filed February 13, 1999.

**32.** See Findings of Fact and Conclusions of Law, filed February 13, 1999.

**33.** Order of Contempt, filed February 13, 1999, page 4.

**34.** Order of Contempt, filed February 13, 1999, pages 4–5.

**35.** Order of Contempt, filed February 13, 1999, page 5.

**36.** *Id.*

**37.** American adduced sworn testimony from Timothy J. Ahern and Douglas G. Herring at this February 17, 1999 hearing. See, generally, Transcript of Proceedings—Hearing on the Issue of Compensatory Damages for Violation of Temporary Restraining Order, taken on February 17, 1999 (hereinafter the "February 17 Transcript").

**38.** See, generally, February 17 Transcript, pages 4–12. See Defendants' Motion to Continue Hearing, filed February 16, 1999 and Defendants' Memorandum in Support of Motion to Continue Hearing, filed February 16, 1999.

**39.** See Order filed February 23, 1999.

**40.** See, generally, Transcript of Proceedings—Hearing on the Issue of Compensatory Damages for Violation of Temporary Restraining Order, taken on April 12, 1999 (hereinafter the "April 12 Transcript") and April 15 Transcript.

satory damages attributable to Defendants' contemptuous conduct.[41] The Court further instructed Defendant APA to deposit an additional $10,000,000.00 into the Registry of the Court,[42] and the Court requested briefing from the parties on the issue of whether Defendants APA, LaVoy, and Mayhew should be held jointly and severally liable for the damages awarded.[43] Since April 15, 1999, the parties have come to some agreements on various (but not all) of the issues involved in this proceeding. The Court will reference at least one of those agreements in this opinion, where appropriate. With this as a backdrop, after hearing and considering all of the evidence presented by the parties at the numerous hearings detailed above, after reviewing and considering the parties' documentary evidence and briefing, after reviewing and considering relevant case law, and after taking into account the record as a whole, the Court therefore makes the following findings of fact and conclusions of law, as set forth below.[44]

## B. *FINDINGS OF FACT*

1. Any below-listed Conclusion of Law which should more properly be listed as a Finding of Fact is hereby incorporated by reference and adopted as a Finding of Fact.

### *STIPULATION OF "MINOR DISPUTE"*

2. The parties have stipulated and agreed[45] (and the Court has so found[46]) that the dispute leading up to the issuance of the TRO was a "minor dispute" under the Railway Labor Act ("RLA"), 45 U.S.C. § 151 *et seq.* Because it was a "minor dispute," Defendants were prohibited by the RLA from engaging in the sick-out as they did.[47] The sick-out was thus an illegal job action.

41. April 15 Transcript, pages 269–273.

42. April 15 Transcript, page 273. This additional $10,000,000.00 deposit was made by Defendant APA on May 4, 1999. See Defendants' Notice of Deposit into Registry of the Court, filed May 5, 1999.

43. April 15 Transcript, page 273.

44. Although substantially set out again in this opinion for the convenience of the parties and any reviewing court, the Court adopts and incorporates by reference the Findings of Fact and Conclusions of Law entered by this Court on February 13, 1999 as part of these Findings of Fact and Conclusions of Law. The Court further adopts and incorporates by reference the findings of fact and conclusions of law incorporated in the TRO as part of these Findings of Fact and Conclusions of Law. The Court further adopts and incorporates by reference any findings of fact or conclusions of law that the Court has made from the bench during these proceedings as part of these Findings of Fact and Conclusions of Law. The Court further adopts and incorporates by reference the Order of Contempt entered by this Court on February 13, 1999. The Defendants' documents that were produced in discovery and admitted into evidence as Plaintiff's Exhibits 9–42 have been

and are incorporated into the record. The Court does not believe that any conflict exists between this Memorandum Opinion (Containing Findings of Fact and Conclusions of Law) and Contempt and Damage Order, on the one side, and any prior Order or Findings of Fact or Conclusions of Law made by the Court in this case, on the other side. However, to the extent that any conflict does exist, this Memorandum Opinion (Containing Findings of Fact and Conclusions of Law) and Contempt and Damage Order controls.

45. See Stipulation filed by the parties on April 28, 1999.

46. Findings of Fact and Conclusions of Law of the Court, filed on February 13, 1999, page 1. Order of Contempt, filed on February 13, 1999, page 3. February 10 Transcript, page 51. Order Adopting Stipulation, filed May 7, 1999, page 1.

47. *See Bhd. of R.R. Trainmen v. Chicago River & Ind. R. Co.,* 353 U.S. 30, 77 S.Ct. 635, 1 L.Ed.2d 622 (1957); *Burlington Northern R.R. Co. v. Bhd. Of Maintenance of Way Employees,* 961 F.2d 86 (5th Cir.1992), *cert. denied,* 506 U.S. 1071, 113 S.Ct. 1028, 122 L.Ed.2d 173 (1993).

### FINDINGS RELATED TO THE CONTEMPT PROCEEDINGS

3. All Findings of Fact herein are made by the Court, as the fact finder, by clear and convincing evidence where appropriate, after assessing the credibility of the witnesses called and the evidence adduced.

4. The Court finds that a TRO was signed by the Court on February 10, 1999 after both Plaintiff and Defendants had an opportunity to be heard in this Court on the issues presented therein.[48] The Defendants subject to the TRO were therefore aware of and knew of the TRO.[49] Counsel for the Defendants and Plaintiff conferred with the Court regarding the language and meaning of the TRO before its entry at 4:00 p.m. on February 10, 1999.[50] The Court found the underlying labor dispute to be a minor dispute.[51]

5. The Court finds that the APA (sometimes referred to herein as the "Union") was informed by the Court in open Court on February 10, 1999 and through the issuance of the TRO that American Airlines planes needed to start flying again immediately and that the unlawful sick-out of Union pilots must immediately cease.[52] Union president Richard LaVoy stated in open court that the Union would comply.[53]

6. The Court finds that the TRO contained the following provisions:

"that the Defendants, and each of them, their agents, successors, deputies, servants and employees, and all persons acting by, in concert with, through or under them, or by and through their orders, are hereby temporarily restrained pending a hearing on the preliminary injunction in this matter:

(a) From calling, permitting, instigating, authorizing, encouraging, participating in, approving or continuing any interference with American's airline operations, including but not limited to any strike, work stoppage, sick-out, slowdown or other concerted refusals to fly over a minor dispute or otherwise in violation of the RLA, 45 U.S.C., §§ 151–188 (1988).

AND IT IS FURTHER ORDERED:

(b) That the said Defendants and said other persons acting in concert with them shall take all reasonable steps within their power to prevent the aforesaid actions, and to refrain from continuing the aforesaid actions if commenced.

(c) That the said Defendants shall instruct all pilots to resume their normal working schedule, and provide Plaintiff a copy of all such instructions.

(d) That APA and the individually named Defendants notify, by the most expeditious means possible, all APA-

48. See, generally, February 10 Transcript.

49. Defendant Mayhew affirmatively testified that the APA knew of the issuance of the TRO on the day of its issuance: "And precisely when the copy of the order came in, I can't tell you, but we were aware we were restrained. No doubt about it." February 12 Transcript, page 77.

50. Page 5 of the TRO contains signatures of counsel for both Plaintiff and Defendants and states that the TRO is "Approved As to Form."

51. Findings of Fact and Conclusions of Law of the Court, filed on February 13, 1999, page 1. Order of Contempt, filed on February 13, 1999, page 3. February 10 Transcript, page 51. Order Adopting Stipulation, filed May 7, 1999, page 1.

52. See, generally, the TRO, and particularly Sections (a)—(i) of the TRO. Also, this Court made the following statement in open court on February 10, 1999 at the conclusion of the TRO hearing: "But we're going to grant the temporary restraining order. Ya'll need to get those airplanes flying quickly. Okay? We'll be in recess." February 10 Transcript, page 89.

53. February 10 Transcript, page 52.

represented pilots employed by American of the issuance, contents and meaning of this Temporary Restraining Order, and produce a copy of all such messages to Plaintiff.

(e) That the notice described in (d) above include a directive from APA to those pilots who are engaging in a sick-out or other concerted refusals to fly to cease and desist all such activity and to cease and desist all exhortations or communications encouraging same.

(f) That APA and the individually named Defendants post the notice described in (d) above to APA's Internet web site, and provide a copy of the notice to the Plaintiff.

(g) That APA and the individually named Defendants include the contents of the ordering paragraphs of this Order on all recorded telephone hotlines under control of Defendants or any of them, until such time as the Court has acted on Plaintiff's Motion for a Preliminary Injunction, and provide a copy of all messages to the Plaintiff." [54]

7. The Court finds that at 7:30 p.m. Central Standard Time on February 10, 1999 (3 ½ hours after the Court's TRO), Richard LaVoy, president of the Union, sent out on the "APA Information Hotline" [55] and posted on the Internet [56] a message (collectively, the "February 10 communication") which was unreasonable under the circumstances and which was wholly inadequate and non-compliant with the TRO. This message was drafted, in part, by Union vice-president Brian Mayhew. [57]

8. The Court finds that the February 10 communication intentionally gave the impression and further conveyed to the Union membership that individual Union members did not have to comply with the TRO. As such, the Court finds that the February 10 communication violated Section (a) of the TRO in that it "permitted," "authorized," and "encouraged" the continued unlawful sick-out of APA pilots subsequent to the issuance of the TRO. This was done by specifically stating that only the Union and the individual defendant Union leaders were "Defendants," thus sending the clear message that individual Union members were not covered. [58] Fur-

**54.** The above-quoted language from the TRO is found on pages 2–4 of the TRO.

**55.** Exhibit 2 to Plaintiff's Motion for Contempt, filed on February 11, 1999, is the Declaration of Roger C. Diseker (the "Diseker Declaration"). Attached to the Diseker Declaration is a transcription of a voice-mail message that was available from the Allied Pilots Association by calling 1–800–323–1470 x. 3225. This voice mail message was recorded and transcribed on the morning of February 11, 1999. Diseker Declaration, ¶ 2. This voice-mail message is the "APA Information Hotline" sent out by Defendant LaVoy at approximately 7:40 p.m. on February 10, 1999.

**56.** Also attached to the Diseker Declaration is a copy of the APA's Internet web page APA Information Hotline. This page was printed at approximately 12:10 p.m. on February 11, 1999. Diseker Declaration, ¶ 3. This document was also admitted as Plaintiff's Exhibit 3 in the contempt proceedings. This message which was posted on the APA's Internet web page is the message posted on the Internet by the APA in the evening of February 10, 1999. This February 10, 1999 message which was posted on the APA's Internet web page is virtually identical to the voice-mail message referenced in the preceding footnote. Since they are virtually identical, this February 10, 1999 message which was posted on the APA's Internet web page and the voice-mail message referenced in the preceding footnote will be collectively referred to as the "February 10 communication."

**57.** February 12 Transcript, pages 46–49; pages 82–84; pages 103–104.

**58.** The February 10 communication states in pertinent part that: "Also, please be aware that where the courts order refers to 'defendants,' it is referring to APA's National Officers, Board of Directors, Negotiating Committee and General Counsel." By implying in the February 10 communication that the TRO applied only to the APA, its National Officers, its Board of Directors and its General Counsel, many of the individual members of the

thermore, the Court further finds that by failing to instruct the approximate 2,300 pilots on the sick list on the evening of February 10[59] to clear the sick list on February 10, Defendants "permitted" the continued unlawful sick-out of APA pilots subsequent to the issuance of the TRO, in violation of Section (a) of the TRO.

9. The Court finds that the February 10 communication violated Section (b) of the TRO in that it did not represent the taking of "all reasonable steps within [Defendants'] power to prevent" the continued unlawful sick-out of APA pilots subsequent to the issuance of the TRO. Counsel argued that the Union had until 12:00 Noon on February 12 to comply. This is not true. By simply reading the TRO, it is clear that deadline was for a report to the Court of the Union's actions to get flight operations back to normal.[60] Furthermore, the Court finds that the failure on the part of Defendants on February 10 to instruct the approximate 2,300 pilots on the sick list on February 10[61] to clear the sick list after the issuance of the TRO is also an act of contempt[62] and a violation of Section (b) of the TRO. It would have been clearly reasonable (and obviously required under the TRO) to instruct the pilots on the sick list to clear the

sick list so that American's operations could be restored to normal.

10. The Court finds that the February 10 communication violated Section (c) of the TRO in that it did not "instruct all pilots to resume their normal working schedule ..." This required language is simply not found anywhere in the February 10 communication.

11. The Court finds that the February 10 communication violated Section (d) of the TRO in that it did not "notify, by the most expeditious means possible, all APA-represented pilots employed by American of the ... contents and meaning" of the TRO. Again, it was made clear to the Union that the issuance of the TRO meant that American Airlines planes needed to start flying again immediately and that the unlawful sick-out of Union pilots must immediately cease.[63] The Court finds that the February 10 communication did not convey this meaning. To get the planes flying again immediately after the issuance of the TRO, it was necessary for Defendants to instruct the approximate 2,300 pilots on the sick list on February 10[64] to clear the sick list. That did not happen on February 10, which is also

---

APA clearly understood that the TRO did not apply to them. For example, on the evening of February 10, 1999, one pilot stated in an e-mail: "I gather from the APA info hotline that the Judges injunction doesn't apply to the masses anyway.... hahahaha...." See Plaintiff's Exhibit 15. Another stated that same night: "You're not listening ... the TRO says the UNION and its OFFICERS are restrained from encouraging a sick out, slowdown, work stoppage etc etc ... He HAS to tell us ... DON'T DO IT!!" See Plaintiff's Exhibit 16. Yet another stated that same night: "As earlier posted, the judge ordered the union LEADERSHIP to not encourage illegal activity ... Call all media, tell them the only thing the union told us is that the union leadership may not condone illegal activity. The judge's order did not affect the pilots." See Plaintiff's Exhibit 21.

**59.** See Plaintiff's Exhibit 1.

**60.** Page 4 of the TRO states: "That APA and the individually named Defendants report by 12:00 noon on February 12, 1999, by sworn affidavit, the methods used to effect the notice described in (d) above to all APA-represented pilots."

**61.** See Plaintiff's Exhibit 1.

**62.** April 12 Transcript, page 74; pages 79–80.

**63.** See the TRO and particularly Sections (a)—(i) of the TRO. February 10 Transcript, page 89.

**64.** Plaintiff's Exhibit 1.

an act of contempt.[65]

12. The Court finds that the February 10 communication violated Section (e) of the TRO in that it did not "include a directive from APA to those pilots who are engaging in a sick-out or other concerted refusals to fly to cease and desist all such activity and to cease and desist all exhortations or communications encouraging same." Again, this required language is simply not found anywhere in the February 10 communication. Section (e) of the TRO was also violated on February 10 by Defendants' failure to instruct the approximate 2,300 pilots on the sick list to clear the sick list. In order to cease and desist the illegal sick-out, it was necessary for the pilots on the sick list on February 10 to clear it. The pilots did not do so because they were not directed to do so by Defendants, which was a violation of Section (e) of the TRO.

13. The Court finds that the February 10 communication violated Section (f) of the TRO, as it is the Court's understanding that the message sent out on the "APA Information Hotline" on February 10 by Defendant LaVoy was also posted virtually verbatim on the APA's Internet web site. By posting the contemptuous and inadequate February 10 communication on the APA's Internet web page, Section (f) of the TRO was violated.

14. The Court finds that the February 10 communication violated Section (g) of the TRO, as all of the ordering paragraphs of the TRO were not contained in the February 10 communication. In fact, only one of the ordering paragraphs (Section (a)) was listed.

15. For the reasons set forth above, the Court finds that the steps taken by the Union (and Defendants LaVoy and Mayhew on behalf of the Union) to comply with the TRO on February 10, 1999 were foreseeably ineffective and would only give the impression and further convey to the Union membership that individual Union members did not have to comply with the TRO. As what should have been a surprise to no one, the sick-out actually increased.[66] The Court finds not only that this result was foreseeable, it was intended.

16. The Court finds that the unlawful sick-out of APA pilots subsequent to the issuance of the TRO continued and actually increased in numbers, all in direct violation of the TRO.[67]

17. The Court finds that the aforementioned violations of the TRO amount to a ratification of the continued unlawful sick-out of APA pilots subsequent to the issuance of the TRO. "Ratification occurs where the union's efforts to return strikers are so minimal that the union's approval or encouragement may be inferred." *United States Steel Corp. v. United Mine Workers of America, Dist. 20*, 598 F.2d 363, 365 (5th Cir.1979). The Court so finds ratification by the Union of the continued unlawful sick-out and charges the Union with responsibility for allowing the continued unlawful sick-out to continue in direct violation of this Court's TRO.

18. The Court believes language from *United States Steel Corp. v. United Mine Workers of America, Dist. 20*, 598 F.2d 363 (5th Cir.1979) is appropriately quoted here because of the language's applicability to this matter: The "return-to-work directives [are] 'so lacking in authoritative forcefulness that they either were not heard

65. April 12 Transcript, page 74; pages 79–80.

66. Plaintiff's Exhibit 43. April 15 Transcript, pages 133–135. Plaintiff's Exhibit 1. February 12 Transcript, pages 14–16. See also the Supplemental Declaration of Timothy J. Ahern, attached as Exhibit 1 to Plaintiff's Motion for Contempt, filed on February 11, 1999.

67. *Id.*

at all ... or were discounted as being merely stage lines parroted for the benefit of some later judicial review.'" *United States Steel Corp.*, 598 F.2d at 366.

The Court finds that the February 10 communication was "so lacking in authoritative forcefulness that [it] either [was] not heard at all ... or [was] discounted as being merely stage lines parroted for the benefit of some later judicial review." *Id.*

19. The evidence demonstrates and the Court finds that the Union ran a phone bank[68] between February 7 and February 10 to call pilots and encourage them to call in sick when in fact they were not sick for the express purpose of economically damaging American Airlines "to get [American] off the dime." (Testimony of Defendant Larry Foster).[69] This amazingly candid, and damaging, testimony confirmed what common sense already compelled: that this illegal sick-out was instigated by the Union[70] and was not "spontaneous" as had been represented to the Court.[71] This illegal activity, as admitted by this Union leader, was Union orchestrated, instigated, and driven, and continued to be so as of the time of the contempt hearing on February 12, 1999. It is the Union who is responsible for the consequent damages. Logic would thus dictate that the Union could have stopped it if they chose to. At the time of the contempt hearing on February 12, 1999, they sadly had not.

20. The evidence further demonstrates that although a phone bank (in the form of a "phone tree") was operational to cause the sick-out,[72] at the time of the contempt hearing on February 12, 1999, one had not been established to call pilots to get them to stop. This is so even though from the operation of the "phone watch," they had both the lines and manpower to take this very reasonable action to end this illegal sick-out and comply with this Court's Order.[73] The Court finds it unreasonable for Contemnors to not take the same measures to end the work stoppage as they had employed to start it. The Court finds this to be a violation of Section (b) of the TRO, which requires the taking of "all reasonable steps within [Defendants'] power to prevent" the continued unlawful sick-out.

21. The majority (12) of the individual defendant union leaders were on sick status at the time of the contempt

---

68. Defendant Larry Foster referred to this as a "phone tree" and stated that "a phone tree is when you're making calls." February 12 Transcript, page 139. Conversely, "a 'phone watch' is when your people are calling in and you're answering them." February 12 Transcript, page 139.

69. February 12 Transcript, pages 140–144.

70. *Id.* Captain Norman Patterson, another Defendant in this cause, also confirmed the existence of an organized sick-out prior to the issuance of the TRO and confirmed that he, too, was personally involved in the organization of the sick-out. February 12 Transcript, pages 173–174.

71. In the February 10, 1999 TRO hearing, one of Defendants' counsel made several references to his understanding of the alleged fact that the APA had not authorized the exercise of self-help through a sick-out (February 10 Transcript, pages 31–32) and that the sick-out was a "spontaneous eruption." February 10 Transcript, page 67. Defendant LaVoy also referred to the situation as being "spontaneous." February 10 Transcript, page 45. Of course, as is now clear from the record, including the sworn testimony of Defendants Foster and Patterson, these representations were not true. At the April 12, 1999 hearing, another of Defendants' counsel candidly admitted that there seemed to be an orchestrated, organized effort to have pilots call in sick (April 12 Transcript, page 31), a complete 180 degree turn from what had earlier been stated to the Court on the record in open court by LaVoy and Defendants' counsel. This apparent lack of honesty is troubling.

72. February 12 Transcript, pages 140–144.

73. *Id.*

hearing on February 12, 1999.[74] They were not present for the hearing.[75] The Court finds that this sent a loud and clear message to the rank and file members of the Union as to how seriously the membership should take the Court's TRO and how seriously they should take the Union's judicially ordered statements to return to work.

22. As to the individual defendants, the Court finds and believes from the evidence that Union president Richard LaVoy and vice-president Brian Mayhew could have immediately ended this sick-out and gotten American Airlines operational again if they had chosen to. The Court further finds that they were the individual defendants responsible for the February 10 communication,[76] the Union's subsequent actions and inactions,[77] and thus the APA's disobedience of the TRO.[78]

23. The Court finds that the flouting of this Court's TRO by the Union on February 10, 1999 by virtue of the February 10 communication led to the continued unlawful sick-out in increased numbers in direct violation of this Court's TRO.[79]

24. Defendants have argued that they purged their contempt as of February 11, 1999 at approximately 1:00 p.m.[80] It was then at that approximate time that the "APA Information Hotline for Thursday, February 11" went out (the "February 11 oral communication").[81] In addition, between 1:00 p.m. and 2:00 p.m. on February 11, 1999, Defendants also provided Exhibit A to Defendants' Exhibit 3 to the three APA National Officers, to the eighteen APA Board of Directors members, to the four APA Negotiating Committee members, and to numerous APA Committee Members by e-mail, fax, or hand-delivery.[82] Defendant LaVoy also convened a conference call that same day to discuss compliance with the TRO.[83] The APA also posted Exhibit A to Defendants' Exhibit 3 on the APA and domicile websites on February 11, 1999.[84] That same day, members of the APA

---

74. February 12 Transcript, pages 68–70.

75. February 12 Transcript, page 7.

76. February 12 Transcript, pages 46–49; pages 82–84; pages 103–104.

77. Defendants' Exhibit 3, the Declaration of Richard T. LaVoy, filed on February 12, 1999, contains an acknowledgment by Defendant LaVoy of his important role in making policy in the APA when Defendant LaVoy states: "I am the principal executive officer of APA responsible for administering the affairs of the Association."

78. Defendant Mayhew testified that the APA's legal department did not "like" the February 10 communication and that "they wanted it changed." February 12 Transcript, page 110. Defendant Mayhew further testified that "legal was upset about the [February 10 communication], they wanted it changed immediately and they were drafting it at that time." *Id.* While this testimony certainly could be construed to mean that the APA legal department recognized that the February 10 communication was inadequate under the terms of the TRO, Defendant Mayhew did not testify with any more particularity about what it was that

caused legal to be upset with regard to the February 10 communication. However, Defendant LaVoy testified that the APA's legal counsel "had no problem with the contents of the [February 10 communication]" but that "it wasn't sufficient to fulfill the judge's order." February 12 Transcript, page 189.

79. Plaintiff's Exhibit 43. April 15 Transcript, pages 133–135. Plaintiff's Exhibit 1. February 12 Transcript, pages 14–16. See also the Supplemental Declaration of Timothy J. Ahern, attached as Exhibit 1 to Plaintiff's Motion for Contempt, filed on February 11, 1999.

80. April 12 Transcript, pages 9–10; page 42.

81. The February 11 oral communication is attached as Exhibit B to Defendants' Exhibit 3 in the contempt proceedings. February 12 Transcript, page 209.

82. February 12 Transcript, pages 194–201. Defendants' Exhibit 3, page 1.

83. Defendants' Exhibit 3, page 1.

84. Defendants' Exhibit 3, page 2.

Board of Directors were instructed to post Exhibit A to Defendants' Exhibit 3 on every domicile bulletin board as soon as possible.[85] That same day, Defendant LaVoy instructed the APA print shop to prepare and mail a copy of Exhibit A to Defendants' Exhibit 3 to all members of the APA.[86] That same day, the APA sent a copy of the Court's TRO by e-mail to approximately 6,350 pilots who are listed with the APA.[87] Finally, on that same day of February 11, 1999, the APA posted a copy of the Court's TRO on its website.[88] (All of these efforts of February 11, 1999 will be collectively referred to as the "February 11 efforts"). However, as stated below, the Court finds that these February 11 efforts came too little too late and were still foreseeably inadequate to have the Union come into compliance with the TRO and end the sick-out.

25. The Court finds there is nothing said in the February 11 efforts that were not known to the Union, its leadership, and counsel that could not have been said in the February 10 communication. Nevertheless, even with the February 11 efforts, the Court rejects Contemnors' arguments to the contrary and finds that the Contemnors did not comply with the Court's TRO through their February 11 efforts.[89]

26. The Court finds that the February 11 efforts failed to comply with the TRO for at least the following reasons: [90]

a. The APA had forewarned its membership that American would probably seek court intervention and an injunction against the illegal sick out.[91]

b. The APA advised its membership through e-mail and other communications that if an injunction was granted against the sick out, then the APA's communications to its membership

85. *Id.*

86. *Id.*

87. *Id.*

88. *Id.*

89. To be clear, the Findings of Fact and Conclusions of Law of this Court, which were filed on February 13, 1999, do NOT find that the contempt had ended with the February 11 efforts of the Union. If the Findings of Fact and Conclusions of Law are read as a whole, it is clear that the Court was not finding that the contempt had ended with the February 11 efforts of the Union. For example, in finding of fact number 18, it states that the efforts "came too little, too late." It is clear that the Court is finding the efforts of February 11 to still be too little (which means not enough). That same finding refers to "the continued unlawful sick-out in increased numbers." These words, which were filed and signed on February 13, speak in the present tense—a CONTINUED unlawful sick-out. These words would not have been in the present tense on February 13 had the February 11 efforts purged the contempt. As another example, in finding of fact number 20, the illegal activity of the sick-out is found to be Union orchestrated, instigated, and driven, and "continues to be so." Again, those words—CONTINUES TO BE SO—which were filed and signed on February 13, speak in the present tense. Again, these words would not have been in the present tense on February 13 had the February 11 efforts purged the contempt. That same finding states that "[l]ogic would thus dictate the Union could stop it if they chose to. At this point [FEBRUARY 13], they sadly have not." See Findings of Fact and Conclusions of Law, filed February 13, 1999. See also April 12 Transcript, pages 75–78. More examples of why the February 13, 1999 Findings of Fact and Conclusions of Law did not find that the contempt had ended on February 11 can be found at pages 74–78 of the April 12 Transcript. At the time of the delivery of the Court's ruling on the morning of the 13th, the Court was unaware of the activities of the APA in the evening of the 12th, which, as discussed later, were reasonable and adequate and ended not only the period of contempt, but ended the illegal sick-out.

90. Points a., b., and c. from paragraph 26 also further support the Court's findings of contempt with regard to the February 10 communication.

91. See, e.g., Plaintiff's Exhibit 9 and Plaintiff's Exhibit 13.

would be censored or sanitized. For example, on the morning of February 10, 1999 (the day that the TRO was issued), APA Board Members D.D. DellaGreca and Mark Hunnibell (both named Defendants in this lawsuit) sent an e-mail that stated:

"In closing we would like to say that this could possibly be one of the last uncensored messages you receive from us. If the company obtains an injunction, your Representative's communications may be restricted. We feel that this would produce the reverse effect and further galvanize the pilot group. Remember, an injunction would apply to APA and its officers, NOT the individual pilot. You could expect hotline barrages and possibly calls from Chief Pilots or even Check Airmen asking you to fly your trips. The decision of your fitness to fly is yours, not theirs, and certainly not a judge's." [92] Jeff Marchand (also a named Defendant in this lawsuit) sent a similar message on the morning of February 10, 1999 when he stated: "It appears that American Airlines is preparing to seek an injunction against the APA. If they are successful the injunction will be against the institution and not individual pilots. Do not allow anybody to pressure you to fly if you are sick. If an injunction is ordered I may be forced to stop these updates." [93] The Court finds that these messages (and others like them) forewarned the members of the APA that they should ignore any court order ordering them to end their illegal sick-out and that they should ignore any return to work messages from the Union. In light of the fact that the APA sent out messages forewarning the members of the APA that they should ignore any court order ordering them to end their illegal sick-out and that they should ignore

any return to work messages from the Union, the Court finds that the February 11 efforts violated Section (a) of the TRO in that they "permitted," "authorized," and "encouraged" the continued unlawful sick-out of APA pilots subsequent to the issuance of the TRO. The Court finds that the APA could and should have instructed their members on February 11 that the prior messages to disregard any court order should themselves be disregarded. Of course, the February 11 efforts failed to do this and therefore "permitted," "authorized," and "encouraged" the continued unlawful sick-out of APA pilots subsequent to the issuance of the TRO, in violation of Section (a) of the TRO. Furthermore, the Court further finds that by failing to instruct the approximate 2,400 pilots on the sick list on February 11 [94] to clear the sick list on February 11, Defendants "permitted" the continued unlawful sick-out of APA pilots subsequent to the issuance of the TRO, in violation of Section (a) of the TRO.

c. The Court finds that the February 11 efforts violated Section (b) of the TRO. The February 11 efforts did not represent the taking of all "reasonable steps within [Defendants'] power to prevent" the continued unlawful sick-out of APA pilots subsequent to the issuance of the TRO because, in light of the fact that the APA sent out messages forewarning the members of the APA that they should ignore any court order ordering them to end their illegal sick-out and that they should ignore any return to work messages from the Union, the Court finds that the APA could and should have instructed their members on February 11 that the prior messages to disregard any court order should

---

**92.** Plaintiff's Exhibit 9.

**93.** Plaintiff's Exhibit 13.

**94.** Plaintiff's Exhibit 1.

themselves be disregarded. Of course, the February 11 efforts failed to do this and therefore did not represent the taking of all "reasonable steps within [Defendants'] power to prevent" the continued unlawful sick-out of APA pilots subsequent to the issuance of the TRO, in violation of Section (b) of the TRO. Furthermore, the Court finds that the failure on the part of Defendants on February 11 to instruct the approximate 2,400 pilots on the sick list on February 11 [95] to clear the sick list after the issuance of the TRO is also an act of contempt [96] and a violation of Section (b) of the TRO. It would have been clearly reasonable (and obviously required under the TRO) to instruct the pilots on the sick list to clear the sick list so that American's operations could be restored to normal.

    d.   The Court finds that the February 11 efforts violated Section (d) of the TRO in that they did not "notify, by the most expeditious means possible, all APA-represented pilots employed by American of the ... contents and meaning" of the TRO. Again, it was made clear to the Union that the issuance of the TRO meant that American Airlines planes needed to start flying again immediately and that the unlawful sick-out of Union pilots must immediately cease. [97] The Court finds that the February 11 efforts did not convey this meaning. In addition, to get the planes flying again as late as February 11, it was necessary for Defendants to instruct the approximate 2,400 pilots on the sick list on February 11 [98] to clear the sick list. That did not happen on February 11, which is also an act of contempt. [99]

    e.   The Court finds that the February 11 efforts violated Section (e) of the TRO in that they did not "include a directive from APA to those pilots who are engaging in a sick-out or other concerted refusals to fly to cease and desist all such activity and to cease and desist all exhortations or communications encouraging same." Nowhere do the February 11 efforts state that the APA is directing those pilots who are engaging in a sick-out or other concerted refusals to fly to cease and desist all such activity and to cease and desist all exhortations or communications encouraging same. In fact, because of this failure on the part of the APA on February 11, messages in violation of Section (e) of the TRO continued to be sent. [100] Section (e) of the TRO was also violated on February 11 by Defendants' failure to instruct the approximate 2,400 pilots on the sick list on February 11 [101] to clear the sick list. In order to cease and desist the illegal sick-out, it was necessary for the pilots on the sick list

95.  *Id.*

96.  April 12 Transcript, page 74; pages 79–80.

97.  See the TRO and particularly Sections (a) –(i) of the TRO. February 10 Transcript, page 89.

98.  Plaintiff's Exhibit 1.

99.  April 12 Transcript, page 74; pages 79–80.

100.  See, e.g., Plaintiff's Exhibit 25, wherein Denis Breslin (a named Defendant in this lawsuit) instructed the pilots based in his Domicile on February 11, 1999 at 3:54 p.m. (almost a full 24 hours after the TRO was entered) that "[a]lthough we are ordered to comply with the following TRO, it should not be construed as an order for sick pilots to return to work. If you are well, you should report for work. If you are sick you should put yourself on the sick list." This message must be viewed against the backdrop of how the Union was defining "sick" during the sick-out instigation stage, e.g. "feeling stress over contract disputes," etc. See Plaintiff's Exhibit 17: "The message we have been putting out for the past several days is—if you are sick you need to call in sick and stay on the sick list until you are 100% fit to fly. In addition, if you [sic] under stress, you are sick."

101.  Plaintiff's Exhibit 1.

on February 11 to clear it. The pilots did not do so because they were not directed to do so by Defendants, which was a violation of Section (e) of the TRO.

f. The Court finds that the February 11 efforts violated Section (f) of the TRO. Again, it was made clear to the Union that the issuance of the TRO meant that American Airlines planes needed to start flying again immediately and that the unlawful sick-out of Union pilots must immediately cease.[102] The Court finds that the February 11 efforts (as posted on the APA's Internet web site) did not convey this meaning on the APA's Internet web site and therefore violated Section (f) of the TRO.

g. The Court finds that although the APA sponsored a passive "phone watch" commencing on February 11, 1999 at approximately 2:00 p.m.,[103] it did not effectively comply with the Temporary Restraining Order by affirmatively ordering the membership to halt the work stoppage by clearing the sick list. Instead, the script provided to the phone watch personnel only instructed pilots who happened to call in to resume their normal working schedule and "to otherwise comply" with the TRO.[104] While it is true that paragraph (c) of the TRO required an instruction for the pilots to resume their normal working schedule, the Union was informed by the Court in open Court on February 10, 1999 and through the issuance of the TRO that American Airlines planes needed to start flying again immediately and that the unlawful sick-out of Union pilots must immediately cease.[105] The Court finds that the script provided to the phone watch did not go far enough in making that point abundantly clear. The Court finds that to comply with Sections (b) and (d) of the TRO, this phone bank should have actively called pilots (in the form of a "phone tree") to instruct them to return to work. It was not enough to be in compliance for the phone bank personnel to merely sit there and wait for the phone to ring (in the form of a "phone watch").[106]

h. The Court finds that the February 11 oral communication [107] was very similar to the contemptuous February 10 communication. For example, the February 11 oral communication still contains the pejorative description of the Court's TRO as "legal maneuvering," as did the February 10 communication. Also, the February 11 oral communication also contains language stating that the TRO "does not constitute a judgment on the merits of the contractual dispute," as did the February 10 communication. The Court finds that these references to "legal maneuvering" and to the TRO not constituting "a judgment on the merits of the contractual dispute" on February 11, 1999 (and on February 10)

---

**102.** See the TRO and particularly Sections (a) –(i) of the TRO. February 10 Transcript, page 89.

**103.** Declaration of Richard T. LaVoy, filed February 16, 1999, page 2 and Exhibit A thereto. Defendants' Exhibit 1.

**104.** Exhibit A to Declaration of Richard T. LaVoy, filed February 16, 1999. Defendants' Exhibit 1.

**105.** See the TRO and particularly Sections (a)–(i) of the TRO. February 10 Transcript, page 89.

**106.** Defendant Mayhew testified on February 12 that he helped prepare this February 11 phone watch script, which this Court has found to be inadequate and in violation of the TRO: "We have done that and we have done a phone watch. I help [sic] prepare yesterday and reviewed a script that we're having our people on the phone watch read. These are phone banks that pilots call in to talk to other pilots. And it says flat out we are instructing you to resume your normal schedule." February 12 Transcript, page 99.

**107.** Exhibit B to Defendants' Exhibit 3.

had the tendency to send a further signal to the APA's membership that they should stay off duty and not comply with the TRO. A significant difference between the February 11 oral communication and the February 10 communication is that the Contemnors deleted wording from the February 11 oral communication that implied that the pilots should stay on the sick list because the Court's Order applied only to the APA, its National Officers, its Board of Directors and its General Counsel.[108] Merely deleting that portion would not somehow now indicate to the members that the TRO now applied to them rather than the Union, its officers, its directors, and its General Counsel. The omission on the 11th did not undo the affirmative message of the 10th. It was not sufficient to comply with the TRO, especially in light of Contemnors' prior directives to the pilots to stay the course, notwithstanding any Court order. The damage had already been done and the February 11 efforts were inadequate to undo that damage, which Contemnors knew. Taking the successive messages as a whole, "sick" pilots would not know on the 11th that the TRO now really did apply to them and that they were to now clear the sick list. Again, as a surprise to no one, they didn't.[109]

i. The Court finds that the even after the February 11 oral communication was issued and the February 11 efforts were undertaken, the sick list of pilots still increased.[110] This fact further demonstrates that the February 11 efforts were not sufficient to comply with the TRO and end the illegal sick-out which the APA started.

j. The Court finds that, as an example of the "wink-and-a-nod" approach that was taken toward complying with this Court's TRO, Defendant Denis Breslin, a member of the APA Board of Directors, even went so far as to instruct the pilots based in his Domicile on February 11, 1999 at 3:54 p.m. (almost a full 24 hours after the TRO was entered) that "[a]lthough we are ordered to comply with the following TRO, it should not be construed as an order for sick pilots to return to work. If you are well, you should report for work. If you are sick you should put yourself on the sick list."[111] Again, this and other messages from Union leadership must be viewed in light of the pre-TRO battle plan that had been discussed as to how to respond to a TRO,[112] the Union's disingenuous definition of "sick" it gave to its members,[113] and the over all use of the code language implemented in communications. Advantage was attempted to be taken of the process of self reporting and self clearing by pilots who are really sick coupled with the universal agreement for the primacy of air safety. In short, the APA leadership believed that because of these facts (that is, that no Judge could determine fitness to fly) any TRO would be unenforceable and that they were thus bullet proof.

A factfinder is allowed to look at the record as a whole, make logical inferences, and generally not be required to check his or her common sense at the courtroom door.

27. For the reasons set forth above, the Court finds that the steps taken by the Union to comply with the TRO on February 11, 1999 were foreseeably ineffective and would only give

---

**108.** February 12 Transcript, page 213.

**109.** Plaintiff's Exhibits 1 and 43.

**110.** April 15 Transcript, pages 136–137. Plaintiff's Exhibit 43.

**111.** Plaintiff's Exhibit 25.

**112.** See, e.g., Plaintiff's Exhibit 17.

**113.** *Id.*

the impression and further convey to the Union membership that individual Union members did not have to comply with the TRO. As what should have been a surprise to no one again, the number of crew cancellations due to post TRO noncompliance actually increased.[114] The Court finds not only that this result was foreseeable, it was intended.

28. The Court finds that the aforementioned violations of the TRO by virtue of the February 11 efforts amount to a ratification of the continued unlawful sick-out of APA pilots subsequent to the issuance of the TRO. "Ratification occurs where the union's efforts to return strikers are so minimal that the union's approval or encouragement may be inferred." *United States Steel Corp.*, 598 F.2d at 365. The Court so finds ratification by the Union of the continued unlawful sick-out and charges the Union with responsibility for allowing the continued unlawful sick-out to continue in direct violation of this Court's TRO.

29. The Court believes language from *United States Steel Corp. v. United Mine Workers of America, Dist. 20*, 598 F.2d 363 (5th Cir.1979) is again appropriately quoted here because of the language's applicability to this matter:

The "return-to-work directives [are] 'so lacking in authoritative forcefulness that they either were not heard at all ... or were discounted as being merely stage lines parroted for the benefit of some later judicial review.'" *United States Steel Corp.*, 598 F.2d at 366.

The Court finds that the February 11 efforts were "so lacking in authoritative forcefulness that [they] either [were] not heard at all ... or [were] discounted as being merely stage lines parroted for the benefit of some later judicial review." *Id.*

30. The court finds that the Contemnors knew the February 10 communication and the February 11 efforts were ineffective to end the work stoppage but did nothing to correct them. Not only was this gamesmanship outrageous, it was patently unwise to think that this transparent charade, much like the "spontaneous" sick-out, would not be seen for what it was. Although the truth of the "spontaneous" sick-out was finally admitted, there are now over 45 million reasons not to admit the truth concerning the efforts made, or lack thereof, to obey the Court and end the illegal job action as ordered.

31. The Court has already found Defendants APA, LaVoy, and Mayhew in civil contempt of court[115] and has already granted Plaintiff's motion for contempt. Plaintiff's Motion for Contempt was filed on February 11, 1999.

32. The Court finds that Contemnors were, at all times, capable of *effectively* communicating with the APA membership to end the work stoppage as evidenced by the fact that they did. At approximately 8:00 p.m.,[116] Central Time, on February 12, 1999, Richard LaVoy, president of the Union, after attending the Show Cause hearing on February 12, 1999 where it was readily apparent that the Court would hold at least some of the Defendants in

---

114. Plaintiff's Exhibit 45.

115. See Order of Contempt, filed February 13, 1999, page 4.

116. The Court notes that there seems to be a discrepancy in the record over whether this message was sent at 8:00 p.m. or 9:00 p.m., Central Time, on February 12. Exhibit "E" to the February 16, 1999 Declaration of Rich-

ard T. LaVoy indicates that the message was sent at 9:00 p.m. However, Exhibit "F" to the February 16, 1999 Declaration of Richard T. LaVoy indicates that the message was sent at 8:00 p.m. The Court will resolve this conflict to give Contemnors' the benefit of the doubt and finds that this message was sent at 8:00 p.m., Central Time, on February 12, 1999.

contempt,[117] recorded a new information hotline message [118] for the APA membership which stated the following:

"I want to make a *personal plea* to all of our pilots: the Association's leadership needs your help in complying with Judge Joe Kendall's Order. We need to get this airline back up and running at full capacity, and we need to do so quickly. Please *clear the sick list immediately* and resume your normal schedule. Again, APA is absolutely serious about doing all we can to comply with the judge's order, and APA's entire leadership is asking for your help in doing so." (emphasis added) (the "February 12 Hotline Message").[119]

The February 12 Hotline Message was also posted on the APA's Internet web site [120] and was sent by e-mail to approximately 6,410 members of the APA.[121] (The Court will collectively refer to all of these transmissions of the February 12 Hotline Message as the "First February 12 instruction to clear the sick list").

33. The Court finds that at approximately 8:45 p.m. on February 12, 1999, the APA National Officers and the APA Board of Directors posted the following message on the APA Internet web site:

"The APA National Officers and Board of Directors are making our best effort to comply with the Temporary Restraining Order issued by Judge Kendall on Wednesday afternoon. All of us in the APA leadership are making a *personal plea* to our fellow pilots to *clear the sick list immediately* and to resume your normal schedule. *APA's leadership firmly believes it is in the best interest of the Allied Pilots to do our part to fully restore the American Airlines system. We need your help to do this and we need it now.*" (emphasis added) (the "Second February 12 instruction to clear the sick

---

117. People tend to see the light when they feel the heat.

118. Defendant Mayhew testified that hotline messages are typically recorded by Defendant LaVoy after both Mayhew and LaVoy review, revise, and approve of the hotline message: "The process that we use normally is that the Director of Communications, Gregg Overman, does a first draft. Frequently a member—or members—of the communications committee are also working with him on the draft. They bring back a rough draft. Typically President LaVoy and myself look at it at that point, and if he was not there at that time—and I believe he was, but if he was not, then I would have looked at it also and would have been asked to make input. Then the—they take my input and the Director of Communications and whoever else is working with him come up with the final draft. That goes back to the president [LaVoy], who makes any changes he has. Then he puts it on the tape." February 12 Transcript, pages 82–83. Defendant Mayhew also affirmatively testified that Defendant LaVoy must approve of any hotline message before it goes out to the membership of the APA: "The president [LaVoy] would approve that. Always he has the last cut." February 12 Transcript, page

92. Defendant LaVoy offered substantially similar testimony to Defendant Mayhew on this typical procedure. February 12 Transcript, pages 46–48. This testimony from Defendants Mayhew and LaVoy further supports the findings of civil contempt made by this Court against Defendants LaVoy and Mayhew. As the individuals (president and vice-president) ultimately responsible for the hotline messages to the APA membership, the Court finds that these individuals could have immediately ended the sick-out by instructing compliance with the terms of the TRO. However, as demonstrated herein, they did not do so until the evening of February 12, 1999 even though they could have done so on the evening of February 10, 1999.

119. Declaration of Richard T. LaVoy, filed on February 16, 1999, page 3 and Exhibits "E" and "F" thereto.

120. Declaration of Richard T. LaVoy, filed on February 16, 1999, page 3 and Exhibit "E" thereto.

121. Declaration of Richard T. LaVoy, filed on February 16, 1999, page 4 and Exhibit "F" thereto.

list").[122]

The Court further finds that at approximately 8:53 p.m. on February 12, approximately 6,410 members of the APA were simultaneously sent the Second February 12 instruction to clear the sick list by e-mail.[123] The Court further finds that on the evening of February 12, Defendant LaVoy instructed that a recorded message be added to the APA phone watch line which would be heard after hours and during times that no line was open.[124] The message included the following statement: "APA's entire leadership requests our pilots *clear the sick list immediately* and *return to their normal work schedule.*" (emphasis added) (the "Third February 12 instruction to clear the sick list").[125] The Court further finds that on the evening of February 12, 1999 (and into February 13), Defendant Foster and other volunteers undertook to affirmatively call fellow DFW pilots with the following message: "Fellow DFW Pilots. A message from Captain Larry Foster and Captain Norm Patterson. We are requesting that *ALL* pilots *return to their normal work schedule immediately* and *clear the sick list as soon as possible.* Please refer to the TRO that was issued February 10, 1999.

Your professionalism is greatly appreciated." (emphasis added in bold) (the "Fourth February 12 instruction to clear the sick list").[126] The Court further finds that on the evening of February 12, Defendant LaVoy convened a conference call with the members of the APA Board of Directors and the APA Negotiating Committee in which he urged Board members to contact pilots in their domiciles and ask that they *immediately clear the sick list* and *resume normal operations* and to ask them to in turn *contact their fellow pilots to request that they do the same.* (emphasis added) (the "Fifth February 12 instruction to clear the sick list").[127]

34. The Court finds that after the First February 12 instruction to clear the sick list, the Second February 12 instruction to clear the sick list, the Third February 12 instruction to clear the sick list, the Fourth February 12 instruction to clear the sick list, and the Fifth February 12 instruction to clear the sick list[128] were made, the pilot sick list began to clear at a dramatic rate.[129] No longer was there any talk about to whom the TRO applied and to whom it did not apply. Gone were any coded instructions about sick pilots not returning to

122. Declaration of Richard T. LaVoy, filed on February 16, 1999, page 3 and Exhibit "D" thereto.

123. Declaration of Richard T. LaVoy, filed on February 16, 1999, page 3 and Exhibits "B" and "C" thereto.

124. Declaration of Richard T. LaVoy, filed on February 16, 1999, page 4.

125. Declaration of Richard T. LaVoy, filed on February 16, 1999, page 4 and Exhibit "G" thereto.

126. Declaration of Richard T. LaVoy, filed on February 16, 1999, page 6 and Exhibit L thereto. The Court notes that this "phone tree" on the evening of February 12, which finally put in place the same efforts to have

pilots end the illegal sick-out as were put in place to begin it (that is outgoing calls to the pilots), contained a personal plea from Defendants Foster and Patterson, both of whom admitted their involvement in organizing the illegal sick-out.

127. Declaration of Richard T. LaVoy, filed on February 16, 1999, page 2.

128. The First February 12 instruction to clear the sick list, the Second February 12 instruction to clear the sick list, the Third February 12 instruction to clear the sick list, the Fourth February 12 instruction to clear the sick list, and the Fifth February 12 instruction to clear the sick list are collectively referred to herein as the "Return to Work Directives."

129. Plaintiff's Exhibit 43.

work. This is because it was silly for anyone to believe that this Court, or that anyone in their right mind, would suggest, much less order, a pilot who is *really* sick to clear the sick list and go fly a jet across the country with hundreds of lives at stake.

35. Within 24 hours of the February 12 Hotline Message being issued, almost a thousand pilots came off the sick list.[130] The Court finds that this miraculous "mass healing" was directly caused by the Return to Work Directives.

36. The Court finds that prior to the Return to Work Directives, there had been no net decrease in the number of pilots on the sick list.[131] In fact, the number of pilots on the sick list actually increased from the time the Court entered its TRO on February 10, 1999 until the Return to Work Directives were made on the night of February 12, after the contempt hearing.[132]

37. The Court finds that the Return to Work Directives were the first good faith efforts by the Contemnors to comply with the terms of the TRO.

38. The Court finds that prior to the Return to Work Directives, the Contemnors had failed and refused to comply with the terms of the Court's TRO. As stated above, until the APA membership received the Return to Work Directives issued on February 12, 1999, the number of pilots on sick status had actually increased from the time this Court entered its TRO at 4:00 p.m. on February 10, 1999.[133] Based on the facts cited above, as well as the other evidence submitted and the Court's assessment of the credibility of the witnesses, the Court, as factfinder, can and does reject the

Contemnors' arguments that the delay in restoring the airline was caused by collective bargaining agreement scheduling requirements or American's alleged intentional cancellation of flights where crews were available. The Court finds those arguments to simply not be supported by the credible evidence.

39. The Court finds that no prior communication from the Contemnors to the pilots contained a "personal plea" or an instruction to "clear the sick list immediately" as the Return to Work Directives did. Whether or not these words were a predetermined signal to end the sick-out, the Return to Work Directives were the Contemnors' first good faith efforts to comply with the terms of the TRO.

40. The Court finds that there was nothing that prevented the Contemnors from promptly complying with the TRO by sending the February 12 Return to Work Directives on February 10 and thus ending the sick-out other than the Contemnors' willful and deliberate refusal to obey the TRO.

41. The evidence before the Court shows that even after the Contemnors got serious about complying with the TRO (by issuing the Return to Work Directives), the APA membership was confused because the Contemnors' pre-TRO communications reasonably could be interpreted to mean that they could ignore such a communication. This confusion is evident from exhibits that include messages from individual APA members to the APA asking for clarification of the Return to Work Directives [134] and responsive communications from the APA that

130. Plaintiff's Exhibit 43. April 15 Transcript, pages 137–138.

131. Plaintiff's Exhibit 43.

132. *Id.;* April 15 Transcript, page 135.

133. *Id.*

134. See, e.g., Plaintiff's Exhibit 33, an e-mail sent at 9:41 p.m. on February 12: "How about sending us a non-domicile rep (hint) message if you guys really mean this."

the Union was indeed serious that the pilots should immediately clear the sick list and do everything the they could to return American to its normal flight schedule.[135] These communications substantiate that the APA's entire course of conduct had the effect of delaying and frustrating compliance with the TRO.

42. The Court finds that the Defendants ended their contempt of the Court's TRO at approximately 8:00 p.m., Central Time, on February 12, 1999 by complying with the Court's TRO. As the Court has found, that is when the February 12 Hotline Message was sent. The remainder of the Return to Work Directives were also sent near that same time.[136]

43. The Court finds that after the Contemnors issued the Return to Work Directives to the pilots, large numbers of pilots on the sick list contacted American, cleared the sick list, and generally made themselves available to fly as soon as possible by acting in ways in which they normally act in performing their jobs.[137] The vast majority of pilots did not wait to clear sick until 4:00 p.m. on the day before their next scheduled sequence as Contemnors' experts suggested would be their "normal work schedule." [138] Instead, once the APA gave the pilots the signal to end the sick out by issuing the Return to Work Directives in the evening on February 12, there was a mass clearing of the sick list.[139] Consequently, there was an immediate and mass return to actual flying under the company's normal operating procedures after the Return to Work Directives were issued on February 12.[140] The Court finds that this was accomplished because the pilots had the option to freely clear the sick list without waiting until 4:00 p.m. on the day before their next scheduled sequence to clear,[141] to volunteer to move or waive duty free periods,[142] and to fly on days off.[143] This is all counter to the Contemnors' damage theory and testimony and also shows that the Contemnors understood the Court's TRO directive to get the airline flying immediately.[144]

135. See, e.g., Plaintiff's Exhibit 34, an e-mail sent on February 13 by Defendant Breslin: "Fellow Pilots, I have received a plethora of email from pilots who question the sincerity of my order to clear the sick list. I will reiterate in no uncertain terms: CALL AND CLEAR FROM THE SICK LIST! Judge Kendall has found APA in contempt of court and levied a $10 million dollar fine against the APA ..." (emphasis original).

136. Thus, the contempt period ran from 7:30 p.m., Central Time, on February 10 until 8:00 p.m., Central Time, on February 12.

137. Plaintiff's Exhibit 43. Plaintiff's Exhibit 51.

138. Plaintiff's Exhibit 51. April 15 Transcript, pages 152–153.

139. April 15 Transcript, page 149; pages 152–153. Plaintiff's Exhibit 51.

140. April 15 Transcript, page 148.

141. Plaintiff's Exhibit 51. April 15 Transcript, page 149; pages 152–153.

142. April 15 Transcript, pages 146–147.

143. April 15 Transcript, page 147. April 15 Transcript, page 166. April 15 Transcript, pages 53–54. See also Plaintiff's Exhibit 46, which demonstrates the number of pilots who would have been available to fly during the period from 12:01 a.m. on February 11 through February 15 if they had cleared the sick list immediately on February 10 after the TRO was issued. April 15 Transcript, pages 153–156. Plaintiff's Exhibit 46 takes into account the options the pilots had available to them to become available to fly on those dates listed on the exhibit: reserve availability, people on days off, people who had movable duty free periods, people who were available to fly their own scheduled sequence, and people who were on duty free periods who would have been asked to move them. April 15 Transcript, page 156.

144. It is preposterous for Defendants to claim that they did not understand the Court's TRO directive to be that American's airplanes must start flying again without delay. In open court on February 10, 1999, the Court made

44. The Court heard expert testimony from Geoffrey Heal and Robert Mann, Jr., expert witnesses for Defendants.[145] The Court hereby finds that the testimony of Robert Mann, Jr. and Geoffrey Heal was unbelievable, untrustworthy and unreliable under Fed. R.Evid. 702.[146] *See, Kumho Tire Co., Ltd. v. Carmichael,* —— U.S. ——, 119 S.Ct. 1167, 1174–75, 143 L.Ed.2d 238 (1999) (concluding that the gatekeeping principles of *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) apply to all expert testimony and not just testimony based on "scientific" knowledge).[147] The Court rejects Mann's and Heal's testimony for the following reasons:

a. The Court finds that the methodology employed by both Mann and Heal was unreliable. Mann's and Heal's attempts to calculate damages based solely on the number of pilots who called in sick after the February 10 communication are unreliable.[148] Their theory rests on the false premise that the contempt damages are not also affected by the Contemnors' failure to get the more than 2,200 other "sick" pilots to clear the sick list and take action to restore normal operations.[149] As one of American's experts stated at the hearing, it was going to take American approximately three days to rebuild its schedule, regardless of when the pilots returned to

the following statement as its *final* words for the day *after* announcing that it was granting the TRO: "But we're going to grant the temporary restraining order. Y'all need to get those airplanes flying quickly. Okay? We'll be in recess." February 10 Transcript, page 89. Whether you use the term "immediately," "quickly," or some other synonym, certainly no one with a straight face could argue that 48 hours and a couple of thousand canceled flights later was what was ordered.

**145.** Mr. Heal's testimony is found at pages 45–86 of the April 12 Transcript. Mr. Mann's testimony is found at pages 88–134 of the April 12 Transcript and at pages 3–82 and pages 216–226 of the April 15 Transcript.

**146.** The Court finds the testimony of Robert Mann, Jr. to be particularly untrustworthy. For example, with respect to Defendants' Exhibit 11, Mr. Mann affirmatively testified that he put Exhibit 11 together between April 12 and April 15, 1999. April 15 Transcript, page 3. His intent was to leave the Court with the impression that the work product was his. However, the Court later discovered that a contracts administrator for the APA, and not Mr. Mann, generated Defendants' Exhibit 11. April 15 Transcript, pages 24–26. This was only discovered by the Court because the witness could not explain the exhibit to the Court which he represented he generated. April 15 Transcript, pages 8–24. Similarly, Mr. Mann also testified that it was publicized to the public in January of 1999 that a potential disruption to American's operations might occur due to the Reno acquisition issue. April 15 Transcript, pages 74–75. Yet, Defendant

Norman Patterson, who admitted that he helped orchestrate the sick-out, testified that he gave the flying public no notice of the planned sick-out. February 12 Transcript, pages 173–174. American's Vice–President of Operations, Planning and Performance, Timothy J. Ahern, testified that he did not know about the sick-out in advance. April 15 Transcript, page 168. He further testified that he did not think the public knew of the sick-out in advance either. *Id.* The Court notes that it is likely that probably several hundred thousand travelers could be located who could and would testify that they did not know about the sick-out in advance.

**147.** If this were a jury trial, the Court would not allow these witnesses' testimony under *Daubert* and its progeny. Furthermore, in this case, as factfinder, the Court finds them not credible in any event.

**148.** April 12 Transcript, pages 50–52; pages 72–73; pages 79–81; pages 101–103. April 15 Transcript, page 63.

**149.** April 12 Transcript, page 74; pages 79–80. Moreover, Mr. Mann's opinions assumed that the Court's TRO meant that the pilots would take their normal time in returning to work under the "normal interpretation" of the parties' collective bargaining agreement. April 15 Transcript, pages 39–40. Incredibly, Mr. Mann made this assumption even though he recognized that the Court had ordered the sick-out to immediately cease and the planes to start flying again immediately. April 15 Transcript, pages 39–40.

work.[150] By waiting until the evening of February 12, 1999 to direct the pilots to clear the sick list, the Contemnors delayed that process of rebuilding the American Airlines schedule by two days by not effectively directing the pilots to clear the sick list and take action to assist in restoring normal flight operations.[151] It is these damages for which they are responsible. Also, the Court notes that one of Defendants' witnesses, a contracts administrator for the APA, testified that there was nothing in the parties' current CBA which prevented the same recovery that began after 8:00 p.m. on February 12 from starting two days earlier after 8:00 p.m. on February 10.[152] "A journey of a thousand miles must begin with a single step." [153]

b. The Court finds that Mann and Heal's testimony was inherently and irreconcilably contradictory. These two experts conflicted on their theory of the harm caused to American by a magnitude of six.[154] Offering damages theories where one expert's conclusion regarding the number of cancellations caused is six times larger than the other and where one expert's theory of damages is almost two times larger than the other leaves the Court to decide which, or if both, of Contemnors' experts is wrong. In this case, the Court has determined and so finds that both Mr. Mann and Dr. Heal are wrong.[155] Therefore, the Court finds their ultimate opinion on the damages inflicted on American unreliable.

c. The Court finds Robert Mann's testimony regarding the reasons the sick list did not begin to decline after the February 11 Communications particularly not credible and unreliable. Mann's reliance on "normal working schedule" [156] under the "Green Book" [157] flies in the face of reality. As the Court found above, when the Contemnors finally ordered the pilots back to work on February 12, the pilots began to clear sick, starting after 8:00 p.m.; the pilots did not wait until 4:00 p.m. on the day before their next scheduled sequence before calling in to clear the sick list.[158] The conduct of the pilots in moving their duty free periods, waiving duty free

---

**150.** April 15 Transcript, page 163.

**151.** Plaintiff's Exhibit 44. Plaintiff's Exhibit 45. April 15 Transcript, pages 142–144. Plaintiff's Exhibit 44 demonstrates that had the pilots cleared the sick list and otherwise resumed flying for American on February 10 as they did on February 12, the airline would have recovered operations two days earlier and 2279 flights would not have been canceled. April 15 Transcript, page 138.

**152.** April 15 Transcript, page 127.

**153.** Lao-tzu (circa 575 B.C.)

**154.** Mr. Mann testified that under his methodology, he determined that there were approximately 680 cancellations as a consequence of 233 new sick calls, which translates roughly into about three cancellations per new caller to the sick list. April 15 Transcript, page 70. He further testified that Dr. Heal determined that there was only one flight cancellation for every two calls. *Id.* Thus, Mr. Mann's determined cancellation rate was six times greater than Dr. Heal's cancellation rate. April 15 Transcript, Transcript, pages 70–71. In other words, Mr. Mann determined that the number of cancellations caused by the 233 new pilots who called in sick after the February 10 communication was six times greater than Dr. Heal determined. Also, Mr. Mann's damage calculation was almost twice that to Dr. Heal's damage calculation. April 15 Transcript, page 222. Defendants' Exhibits 5, 8, and 9.

**155.** April 15 Transcript, pages 222–226.

**156.** Mr. Mann made this assumption even though he recognized that the Court had ordered the sick-out to immediately cease and the planes to start flying again immediately. April 15 Transcript, pages 39–40.

**157.** The "Green Book" is the current CBA between American and the APA.

**158.** Plaintiff's Exhibit 51. April 15 Transcript, pages 152–153.

periods, and flying on days off [159] is consistent with the immediate restoration of normal operations by getting the planes flying again immediately,[160] an objective the Court clearly communicated at the TRO hearing.[161] Mann's testimony and the assumptions that underlie his damages calculations are inconsistent with the objectives imposed on Contemnors by the TRO and the reality of the pilots' actions as evidenced by their conduct once they were directed to return to work on February 12.[162]

45. The Court bases its finding of damages upon the expert witness testimony of Timothy J. Ahern and Douglas G. Herring, both of American Airlines, Inc. Timothy Ahern is the Vice–President of Operations, Planning and Performance at American.[163] Douglas G. Herring is the Vice–President and Controller of American.[164]

46. The Court finds that the testimony of Mr. Ahern and Mr. Herring was credible, reasonable, reliable, and trustworthy under the provisions of Fed.R.Evid. 702 and 703 with the limitations noted below. *See, Kumho Tire Co., Ltd.,* —— U.S. at —— - ——, 119 S.Ct. at 1174–75 (concluding that the gatekeeping principles of *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) apply to all expert testimony and not just testimony based on "scientific" knowledge).

a. The Court finds that the methodologies and conclusions of Timothy J. Ahern and Douglas G. Herring are credible, reasonable, reliable, and trustworthy under the provisions of Fed.R.Evid. 702 and 703. *See also Hudson Transit Lines, Inc. v. Freund,* 509 F.Supp. 1172, 1178–79 (E.D.N.Y.1981) (awarding lost revenue contempt compensation); *Long Island R.R. Co. v. Bhd. of R.R. Trainmen,* 298 F.Supp. 1347, 1350 (E.D.N.Y.1969) (awarding lost revenue as contempt compensation in an RLA case).

b. The Court credits the evidence and believes that the overall damages that were caused by the ten day work stoppage were approximately $200 to 250 million, as American reported to the investment community.[165]

c. The Court accepts and finds as fact Mr. Herring's evidence that American suffered losses of $50.96 million from the two day extension of the sick-out caused by the contempt.[166] The compensatory contempt damages for the two day extension of the work stoppage are calculated as the difference between the revenue that American would have received had the Contemnors complied with the Temporary

---

159. April 15 Transcript, page 166. Mr. Mann even recognized that when pilots began clearing the sick list after the contempt proceeding of February 12, many of those pilots likely as made themselves available to fly on duty free periods and on days off. April 15 Transcript, pages 53–54.

160. April 15 Transcript, page 166.

161. By communicating at the TRO hearing that the planes needed to start flying again quickly (February 10 Transcript, page 89), the Court was, of course, telling Defendants that the American system needed to be restored to its normal operations in quick and immediate fashion. Given the context of coming to Federal court for extraordinary relief, it was clear to everyone in the courtroom that immediate system restoration to end the bleeding was what was contemplated and indeed ordered. The written TRO is equally clear. To suggest otherwise, like suggesting the sick-out was "spontaneous," is disingenuous.

162. Plaintiff's Exhibit 44. April 15 Transcript, pages 148–149.

163. February 12 Transcript, page 12.

164. February 17 Transcript, page 37.

165. See Exhibit 2 to Defendants' Exhibit 5 (the report of one of Defendants' expert witnesses, Geoffrey Heal).

166. April 15 Transcript, pages 185–189. Plaintiff's Exhibit 48.

Restraining Order when it was issued on February 10, 1999 at 4:00 p.m. and the revenue that American actually received during the period of contempt (with appropriate offsets for expenses incurred and expenses not incurred because the airline was not operating to capacity) ending at 8:00 p.m. on February 12, 1999.[167] The Court, however, makes the following deductions to American's damage figure to give the Contemnors the largest benefit of the doubt possible:

(i) The Court finds that it is appropriate in this matter to apply a 6% reduction to American's revenue losses based on Mr. Herring's testimony that 6% was the largest margin of error Mr. Herring had ever experienced in projecting American's revenue over the 13–14 month period prior to the April 15, 1999 hearing.[168] The Court finds that despite the fact that Mr. Herring testified that he was correct to 1–2% over the past 12 months prior to the April 15, 1999 hearing,[169] it is appropriate to give the Contemnors the benefit of this unusually large 6% error rate.[170]

(ii) The Court finds that is also appropriate, under these circumstances, to reduce the adjusted American loss figure by five percent (5%) for "booking away" revenue losses resulting from pre-TRO sick-out activity.[171]

(iii) The Court finds that, after an exhaustive review of the evidence before it, there exists no other valid deduction in the losses suffered by American.[172]

47. The Court finds that, after the deductions described above are taken, American has suffered Forty-five Million, Five Hundred Seven Thousand, Two Hundred Eighty Dollars ($45,507,280.00) in lost revenue, unnecessary costs and expenses attributable to the Allied Pilots Association's, Richard LaVoy's, and Brian Mayhew's contempt of this Court's Temporary Restraining Order of February 10, 1999.[173] These damages result from the cancellation of 2,279 flights caused by contempt of the Court's TRO [174] and associated revenue losses on flights that were not canceled but which had a lower load factor (which resulted, for example, because passengers' connecting flights were canceled).[175]

48. The Court finds that the Contemnors are jointly and severally liable for these damages ($45,507,280.00).

49. The Court finds that there is insufficient basis in the evidentiary record for apportioning liability among the Contemnors.

50. The Court finds that Contemnors acted in concert in violating the TRO in that the APA violated the TRO in overwhelming part by virtue of the actions (and/or the inactions) of Defendants LaVoy and Mayhew.

51. The Court finds that Defendants LaVoy and Mayhew failed to cause the APA to comply with the TRO and are therefore responsible for the APA's disobedience of the TRO. Accordingly, Defendants LaVoy and

**167.** April 15 Transcript, pages 185–194; page 213. Plaintiff's Exhibits 47–50. February 17 Transcript, pages 40–41; pages 47–49.

**168.** April 15 Transcript, page 210.

**169.** April 15 Transcript, page 209.

**170.** April 15 Transcript, page 271.

**171.** April 15 Transcript, pages 271–272.

**172.** April 15 Transcript, page 272. The Court, as factfinder, therefore rejects any other arguments made by Defendants and their experts in support of lowering American's damage award.

**173.** April 15 Transcript, pages 272–273.

**174.** Plaintiff's Exhibit 44. April 15 Transcript, page 138; pages 142–144.

**175.** April 15 Transcript, pages 189–193.

Mayhew are as equally liable as the APA for the resulting contempt.

52. The Court finds that LaVoy and Mayhew aided, abetted, and conspired with the APA to evade compliance with this Court's TRO, thereby rendering LaVoy, Mayhew, and the APA in contempt of Court.

53. The Court finds that LaVoy, Mayhew, and the APA joined together to evade compliance with this Court's TRO, thereby rendering LaVoy, Mayhew, and the APA jointly and severally liable for the amount of damages resulting from their contumacious conduct.

54. The Court finds that American should be awarded appropriate post-judgment interest on the amount of damages awarded.[176]

## C. CONCLUSIONS OF LAW

1. Any above-listed Finding of Fact which should more properly be listed as a Conclusion of Law is hereby incorporated by reference and adopted as a Conclusion of Law.

### STIPULATION OF "MINOR DISPUTE"

■ 2. The parties have stipulated and agreed[177] (and the Court has so found[178]) that the dispute leading up to the issuance of the TRO was a "minor dispute" under the Railway Labor Act ("RLA"), 45 U.S.C. § 151 et seq. Because it was a "minor dispute," Defendants were prohibited by

the RLA from engaging in the sick-out as they did.[179] The sick-out was thus an illegal job action.

### CONCLUSIONS OF LAW RELATED TO CONTEMPT PROCEEDINGS

■ 3. "An order issued by the Court with jurisdiction over the subject matter and person must be obeyed until it is reversed." United States Steel Corp., 598 F.2d at 368.

■ 4. "The party seeking the contempt adjudication bears the burden of establishing the defendant's violation by clear and convincing evidence." Black Diamond Coal Mining Co. v. Local Union # 8460, United Mine Workers of America, 597 F.2d 494, 496 (5th Cir.1979).

5. "A sanction imposed to compel obedience to a lawful court order or to provide compensation to a complaining party is civil." New York State National Organization for Women v. Terry, 886 F.2d 1339, 1351 (2nd Cir. 1989), cert. denied, 495 U.S. 947, 110 S.Ct. 2206, 109 L.Ed.2d 532 (1990), citing United States v. United Mine Workers of America, 330 U.S. 258, 303–04, 67 S.Ct. 677, 91 L.Ed. 884 (1947). This is a civil contempt proceeding.

■ 6. "The movant in a civil contempt proceeding bears the burden of establishing by clear and convincing evidence: (1) that a court order was in effect; (2) that the order required cer-

---

**176.** The parties were asked by the Court to brief the issue of whether post-judgment interest should be awarded in this case with regard to the contempt compensatory damages. Plaintiff American filed a brief on June 21, 1999 arguing in favor of the awarding of post-judgment interest. Defendants did not file a brief. Defendants' counsel orally notified the Court on June 21, 1999 that no such brief would be forthcoming from Defendants.

**177.** See Stipulation filed by the parties on April 28, 1999.

**178.** Findings of Fact and Conclusions of Law of the Court, filed on February 13, 1999, page 1. Order of Contempt, filed on February 13, 1999, page 3. February 10 Transcript, page 51. Order Adopting Stipulation, filed May 7, 1999, page 1.

**179.** See Bhd. of R.R. Trainmen v. Chicago River & Ind. R. Co., 353 U.S. 30, 77 S.Ct. 635, 1 L.Ed.2d 622 (1957); Burlington Northern R.R. Co. v. Bhd. Of Maintenance of Way Employees, 961 F.2d 86 (5th Cir.1992), cert. denied, 506 U.S. 1071, 113 S.Ct. 1028, 122 L.Ed.2d 173 (1993).

tain conduct by the respondent; and (3) that the respondent failed to comply with the court's order. Wilfulness is not an element of civil contempt. After the movant has shown a *prima facie* case, the respondent can defend against it by showing a present inability to comply with the subpoena or order." *Petroleos Mexicanos v. Crawford Enterprises, Inc.*, 826 F.2d 392, 401 (5th Cir.1987) (emphasis original) (citations omitted). The Plaintiff has met its burden in this matter by clear and convincing evidence.

7. A fine for civil contempt is a means to enforce a court order of injunctive relief, which in this case is the TRO. A fine for civil contempt may be compensatory in nature or may be designed to coerce behavior. *See United Mine Workers of America*, 330 U.S. at 303–304, 67 S.Ct. 677 ("Judicial sanctions in civil contempt proceedings may, in a proper case, be employed for either or both of two purposes: to coerce the defendant into compliance with the court's order, and to compensate the complainant for losses sustained"); *see also Travelhost, Inc. v. Blandford*, 68 F.3d 958, 961–62 (5th Cir.1995) ("Civil contempt can serve two purposes. It can be used to enforce compliance with a court's order through coercion, or it can be used to compensate a party who has suffered unnecessary injuries or costs because of contemptuous conduct"); *Norman Bridge Drug Co. v. Banner*, 529 F.2d 822, 827 (5th Cir. 1976) ("Compensatory civil contempt reimburses the injured party for the losses and expenses incurred because of the adversary's noncompliance"). To give a court the power to issue injunctive relief without the power to fine those individuals who disobey the court order is to give a court the power to grant a remedy without effective means to enforce it. When the gauntlet is thrown down to the authority of the Court and its lawful orders, the Court has no choice but to pick it up.

8. A court can issue fines to enforce injunctive relief, including a TRO.

9. "[O]nce the plaintiff has proved that he has suffered harm because of a violation of the terms of an injunction, compensatory damages are appropriate." *Vuitton et Fils S.A. v. Carousel Handbags*, 592 F.2d 126, 130 (2nd Cir.1979).

10. "The Court has broad discretion in the assessment of damages in a civil contempt proceeding. The purpose is to compensate for the damages sustained." The public rights that a court order seeks to protect are important measures of the remedy. *See Long Island R.R. Co.*, 298 F.Supp. at 1350.

11. The Court concludes that "[w]here compensation is intended, a fine is imposed, payable to the complainant. Such fine must of course be based upon evidence of complainant's actual loss, and his right, as a civil litigant, to the compensatory fine is dependent upon the outcome of the basic controversy." *United Mine Workers of America*, 330 U.S. at 304, 67 S.Ct. 677. The "basic controversy" in the case before this Court (a suit for injunctive relief from an alleged illegal job action under the RLA) is not the dispute over the integration by American of Reno and the Scope Clause of the CBA. The basic controversy in this case is whether the APA was engaged in an illegal job action under the RLA and whether they should be ordered to stop via a TRO and Injunction after a hearing. This basic controversy was resolved in favor of American when the Court found and the APA later stipulated that this was a "minor dispute" under the RLA, thus making the APA instigated sickout an illegal job action under the RLA. Furthermore, the parties have

now asked the Court to enter an agreed injunction. If the TRO had been obeyed, the APA would not owe a dime because damages are not available under the RLA. But the Defendants are liable for damages as compensation for losses suffered because of their contemptuous acts of not obeying and ending the illegal sick-out when ordered.

12. "[C]ompensatory civil contempt reimburses the injured party for the losses and expenses incurred because of his adversary's noncompliance ... There must be evidence showing the amount of the loss, since the court must have some basis for determining both the amount and the reasonableness of the costs claimed." *Sebastian v. Texas Department of Corrections,* 558 F.Supp. 507, 510 (S.D.Tex.1983). In this matter, there is ample evidence showing the amount of the loss to American caused by Contemnors' contumacious conduct. Similarly, the Court concludes that the evidence shows that the amount of the loss American claims to have suffered because of Contemnors' contumacious conduct to be more than reasonable.

13. "In awarding a compensatory fine in a civil contempt proceeding, the question of amount falls within the broad discretion of the trial court." *Id., citing Mead Johnson & Co. v. Baby's Formula Service, Inc.,* 402 F.2d 23 (5th Cir.1968). "Accordingly, it is the Court's duty to determine the amount which is reasonable in view of the circumstances." *Sebastian,* 558 F.Supp. at 510.

14. A union can be held in contempt "if the strike was conducted or encouraged by its members functioning as a union, by its agents acting within their apparent authority, or by those whose acts the Union can be held to have ratified by its inaction."

*Black Diamond Coal Mining Co.,* 597 F.2d at 495. The same reasoning applies, as here, in an illegal sick-out job action.

15. "Ratification occurs where the union's efforts to return strikers are so minimal that the union's approval or encouragement may be inferred." *United States Steel Corp.,* 598 F.2d at 365. The "circumstances surrounding the strike may create an inference that the Union condones or ratifies the illegal activity and the Union will be held responsible by its failure to take measures to end the strike." *Black Diamond Coal Mining Co.,* 597 F.2d at 495. In this case, the Court finds ratification of the continued unlawful sick-out by the APA and, accordingly, the APA was in contempt of the TRO as set forth herein.

16. The TRO in this case applied on its face and was directed to Defendants APA, LaVoy, and Mayhew, among others. The TRO states in pertinent part: "IT IS ORDERED, that the Defendants, and each of them, their agents, successors, deputies, servants and employees, and all persons acting by, in concert with, through or under them, or by and through their orders, are hereby temporarily restrained ..." [180] There is no doubt that Defendants APA, LaVoy, and Mayhew were all equally bound by the terms of the TRO. Defendants APA, LaVoy, and Mayhew all received notice of the TRO, failed to comply with the TRO, and are consequently all guilty of contempt. Defendants APA, LaVoy, and Mayhew are responsible for the damages suffered and for disobedience to this Court's lawful Order, the TRO. "So long as the defendants knew the court was enjoining them and were cognizant of the terms of the injunction, they are responsible

**180.** TRO, pages 2–3.

for the consequences." *Carousel Handbags,* 592 F.2d at 129 n. 5.

17. A business entity's officers can be held in contempt for their failure to cause their corporation (or an unincorporated association in this case [181]) to comply with a court's order. *Wilson v. United States,* 221 U.S. 361, 376–77, 31 S.Ct. 538, 55 L.Ed. 771 (1911); *Connolly v. J.T. Ventures,* 851 F.2d 930, 935 (7th Cir.1988) ("a command to the corporation is in effect a command to those who are officially responsible for the conduct of its affairs. If they, apprised of the writ directed to the corporation, prevent compliance or fail to take appropriate action within their power for the performance of the corporate duty, they, no less than the corporation itself, are guilty of disobedience, and may be punished for contempt"); *See also N.L.R.B. v. Maine Caterers, Inc.,* 732 F.2d 689, 691 (1st Cir.1984) ("[A]n officer, responsible for the corporation's affairs and for its disobedience, may be held liable for contempt.") As evidenced by the contumacious conduct set forth in the Findings of Fact above, Defendants LaVoy and Mayhew failed to cause the APA to comply with the TRO and are therefore responsible for the APA's disobedience of the TRO. Accordingly, Defendants LaVoy and Mayhew are as equally liable as the APA for the resulting contempt.

18. "[A]ny party who knowingly aids, abets, or conspires with another to evade an injunction or order of a court is also in contempt of that court." *N.L.R.B. v. Laborers' International Union of North America,*

*AFL—CIO,* 882 F.2d 949, 954 (5th Cir.1989). As evidenced by the contumacious conduct set forth in the Findings of Fact above, the Court finds that LaVoy and Mayhew aided, abetted, and conspired with the APA to evade compliance with this Court's TRO, thereby rendering LaVoy, Mayhew, and the APA in contempt of Court.

19. The Court concludes that in determining the loss to American because of the Contemnors' actions, the Court should "determine whether a reasonable person could find the [revenue losses] were established with reasonable certainty." *DSC Communications Corp. v. Next Level Communications,* 107 F.3d 322, 329 (5th Cir.1997); *see also Thompson and Wallace of Memphis, Inc. v. Falconwood Corp.,* 100 F.3d 429, 435 (5th Cir.1996) (same).

20. The Court concludes that "it is not necessary that recovery for future [revenue losses] should be established by exact calculation, as it is enough to have data from which these [revenue losses] may be ascertained with a reasonable degree of certainty and exactness." *Fiberlok, Inc. v. LMS Enterprises, Inc.,* 976 F.2d 958, 962 (5th Cir.1992).

21. The Findings of Fact regarding the amount of compensatory damages American has suffered as a result of the contempt ($45,507,280.00) are made with reasonable certainty based upon the evidence submitted.

22. The Court finds that the Contemnors are jointly and severally liable for the amount of compensatory damages American has suffered as a result of the contempt ($45,507,-280.00).[182]

**181.** The Court notes that in *Terry,* the leader of an entity not organized in corporate or partnership form named as a defendant in that case (Operation Rescue) was held in contempt and was held jointly and severally liable with the entity for the sanctions imposed. *Terry,* 886 F.2d at 1351–52.

**182.** Defendants have repeatedly made various arguments to this Court which they allege

23. Where parties "join together to evade a judgment, they become jointly and severally liable for the amount of damages resulting from the contumacious conduct." *Laborers' International Union of North America, AFL—CIO*, 882 F.2d at 955. The Court finds that LaVoy, Mayhew, and the APA joined together to evade compliance. with this Court's TRO, thereby rendering LaVoy, Mayhew, and the APA jointly and severally liable for the amount of damages resulting from their contumacious conduct. Moreover, since the TRO in this case applied on its face to Defendants APA, LaVoy, and Mayhew, and since the APA, LaVoy, and Mayhew all had actual knowledge of the TRO and failed to comply with it as set forth above, LaVoy, Mayhew, and the APA are jointly and severally liable for the amount of damages resulting from their contumacious conduct.

24. The Court concludes that the Contemnors are not entitled to mitigate the damage they have inflicted on American by arguing that they *intended* to comply with the TRO because "the mental state of the violator should not determine the level of compensation due." *Cook v. Ochsner Foundation Hosp.*, 559 F.2d 270, 272 (5th Cir.1977). The law requires the Contemnors to pay for what they have broken.[183] *Jim Walter Resources, Inc. v. International Union, United Mine Workers of America*, 609 F.2d 165, 169 (5th Cir.1980) ("What they did

preclude the awarding of compensatory damages to American as a result of Defendants' contempt in this case. For example, Defendants have argued that American cannot recover compensation from the APA in a civil proceeding, *including a civil contempt proceeding*, because of the "RLA's proscription against monetary recoveries by employers against unions." Defendants' Memorandum in Support of their Motion to Dismiss Compensatory Civil Contempt Claims and to Remit or Vacate Fines already Assessed, filed April 6, 1999, page 12. This Court flatly rejects this argument. To begin with, if this Court were awarding "damages" for violating the RLA, the number would be in the neighborhood of $200–250 million for the total time the illegal sick-out was conducted. Furthermore, other courts have rejected similar types of arguments: "A plaintiff's right to a compensatory fine is contingent upon the outcome of the main cause. (citations omitted). However, this does not mean that since damages are not recoverable in a Title VII action, a compensatory fine may not be levied for noncompliance with an injunction in a Title VII case." *Sebastian*, 558 F.Supp. at 509, *citing Hutto v. Finney*, 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978). In fact, at least one other court has awarded compensatory damages as a sanction in a civil contempt proceeding in which the underlying proceeding involved the RLA. *See Long Island R.R. Co.*, 298 F.Supp. at 1350. This Court may of course award compensatory damages to American which result from Defendants' contumacious conduct. Were it otherwise, this Court, and other courts, would be faced with only being able to issue toothless injunctions without a means to enforce them. The Defendants cited no authority, and the Court could find none, in the 70 plus years of RLA jurisprudence that even remotely suggests that in a RLA case a transportation industry union is granted "King's X" for disobedience of a court order and consequent damages. Thus, this Court similarly rejects Defendants' argument (as set forth in Defendants' Memorandum of Law in Opposition to Imposition of Joint and Several Liability on Defendants' LaVoy and Mayhew, filed April 28, 1999) that holding Defendants LaVoy and Mayhew jointly and severally liable for the compensatory damages awarded in this case would conflict with federal statutes and policy barring individual liability and damages against union officials and members for unlawful work stoppages. Defendants' reliance upon *Complete Auto Transit v. Reis*, 451 U.S. 401, 101 S.Ct. 1836, 68 L.Ed.2d 248 (1981), *Atkinson v. Sinclair Refining Co.*, 370 U.S. 238, 82 S.Ct. 1318, 8 L.Ed.2d 462 (1962), and the Norris–LaGuardia Act is therefore misplaced, inapplicable, and inappropriate in the context of a civil contempt proceeding. The money is not being ordered paid because of the illegal work stoppage, but for the damages caused by not ending it when ordered to do so by a federal court.

**183.** Defendant LaVoy also acknowledged to the Court that the concept of "we should all pay for what we break" is "a fair statement." February 12 Transcript, page 67.

as a group, they are responsible for as a group"—assessing civil contempt fine against union for violating TRO).

25. "[A] civil contempt fine may not exceed the actual loss to the complainant caused by the actions of respondent, lest the contempt fine become punitive in nature, which is not appropriate in a civil contempt proceeding." *Laborers' International Union of North America, AFL—CIO,* 882 F.2d at 955. The Court has taken great pains to make sure that the compensatory damages awarded to American do not exceed the actual loss to American caused by Defendants' contumacious conduct. This is because this is a civil contempt proceeding and not a criminal contempt proceeding. No one is going to jail and not one dime is being paid to the government as a fine because of the contumacious conduct of the Defendants.

26. 28 U.S.C. § 1961(a) states in pertinent part that "[i]nterest shall be allow on any money judgment in a civil case recovered in a district court." Under this statute, post-judgment interest must be awarded to American. *Reeves v. International Tel. & Tel. Corp.,* 705 F.2d 750, 752 (5th Cir.1983) (per curiam) (post-judgment "interest was allowable of right, not as a matter of discretion"); *See Sebastian,* 558 F.Supp. at 513 (awarding post-judgment interest on a compensatory award of damages for civil contempt).

These Findings of Fact and Conclusions of Law are hereby adopted and made the Findings of Fact and Conclusions of Law of this Court.

D. *CONCLUSION*

After taking the entire record into account and after making the Findings of Fact and Conclusions of Law set forth above, Defendants APA, LaVoy, and Mayhew are accordingly held responsible for their contemptuous actions in violating this Court's TRO. This Court therefore awards to American the compensatory damages which are attributable to these Defendants' contemptuous actions. This Court awards American $45,507,280.00 in such compensatory damages, and Defendants APA, LaVoy, and Mayhew are held jointly and severally liable for these damages. Post-judgment interest at the rate of 4.879% is also awarded to American until the Judgment is paid. A Judgment Awarding Compensatory Damages For Civil Contempt is being entered by the Court concurrently herewith.